Filed 12/10/25  P. v. Webster CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FELIPE J. WEBSTER ,<br><br>    Defendant and Appellant. | D084999<br><br><br><br>(Super. Ct. No. SCS326609) |

APPEAL from a judgment of the Superior Court of San Diego County, Maryann D'Addezio, Judge.  Affirmed.

James R. Bostwick, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric C. Swenson and Heather M. Clark, Deputy Attorneys General.

Following his guilty plea to battery on a peace officer (Pen. Code,[1] § 243, subd. (c)(2)), Felipe J. Webster appeals from the judgment. He contends that the trial court erred in denying his motion for pretrial mental health diversion pursuant to section 1001.36.

We conclude that the trial court did not abuse its discretion. The evidence supports a finding that Webster would pose an unreasonable risk of danger to public safety if treated in the community within the meaning of section 1001.36, subdivision (c)(4). Accordingly, we affirm the judgment.

I.

FACTUAL AND PROCEDURAL BACKGROUND

In ruling on the motion for pretrial mental health diversion, the trial court relied on the factual description contained in the police reports attached to Webster's motion. We accordingly look to those police reports in setting forth the following summary of the relevant facts.[2]

A.    *The Incident on May 14, 2023*

The incident that gave rise to Webster's prosecution occurred on May 14, 2023. Webster and his girlfriend were loudly arguing outside their

---

[1]    Unless otherwise indicated, all further statutory references are to the Penal Code.

[2]    In their respondent's brief, the People cite extensively from the reporter's transcript of Webster's preliminary hearing that occurred on July 17, 2023. However, the trial court did not have the testimony from the preliminary hearing before it when it ruled on the motion for mental health diversion. The preliminary hearing was presided over by a different trial court judge, and no transcript from the preliminary hearing was introduced during the proceedings on the motion for mental health diversion. Accordingly, we do not rely on the reporter's transcript from the preliminary hearing when setting forth the relevant factual background or analyzing the merits of Webster's appeal.

apartment, and the girlfriend then locked herself inside her car. Webster used a knife to try to pry open the locked car door. One witness described the knife as a "butter knife." Another witness described it as "a knife used to cut meat, like a butcher knife."

A neighbor intervened to tell Webster to calm down because he was scaring the neighbor's family members. Webster reacted by yelling at the neighbor and telling him to go back to Mexico. In response, the neighbor took off his shirt to prepare to fight with Webster. The neighbor's statement explains what happened next. "While he was yelling at me, he still had the butter knife in his hand. He then raised the knife to his chest as if he was squaring up to fight with me. . . . During this, my wife came out and got in between us to try and separate us. I was scared that he was going to stab my wife, so I pushed her out of the way, and I continued toward the male and threw a punch. He rushed towards me, and we both began fighting."[3]

When a friend of the neighbor approached to break up the fight, Webster ran at him with the knife and stabbed toward him in a downward motion. The friend dodged the knife (which he described as a butcher knife), but Webster punched him in the face. Next, the 15-year-old stepson of the neighbor tried to intervene, and Webster punched him in the chest.

Webster eventually went back inside his apartment, from which he continued to yell at his neighbors. Multiple police officers arrived and attempted to contact Webster, but he would not leave his apartment. Webster was very agitated and yelled at the officers. Among other things,

---

[3]    We note that although the neighbor was the witness who used the term "butter knife," he also said he was afraid Webster was going to "stab" his wife with it. The neighbor's fear that his wife would be stabbed suggests that the knife was sharp and had the potential to be used as a dangerous weapon.

Webster told the officers, "You can suck my f---ing d--k," and threatened, "I've got dogs too, if you guys want to try to come in. I've got a big ass dog."

The police officers decided to detain Webster's girlfriend because she was moving in and out of the apartment, creating a safety issue. When one of the officers moved to physically detain the girlfriend, Webster charged out of his apartment toward the officer and yelled, "You're going to get f---ing dropped." Webster inserted his thumb into the officer's eye socket and applied pressure, resulting in a subconjunctival hemorrhage that required medical attention.

Other officers reacted by taking Webster to the ground. Webster actively resisted the officers as they attempted to get him under control. While resisting, Webster grabbed the baton of one of the officers. According to that officer's statement, "At some point as I held down Webster, I saw my baton in Webster's hand. It is unknown if it fell out of my baton holster or Webster grabbed it. I put my knee on Webster's hand to gain control of it and physically pulled my baton away from him. I then threw my baton away from Webster. Webster was handcuffed shortly after." When Webster exited his apartment, he let out his two pit bull dogs. One of the dogs bit down aggressively on a police officer's shoe, causing significant pain in the officer's foot.

B.    *Webster's Motion For Pretrial Mental Health Diversion*

An information was filed against Webster on July 31, 2023, charging him with assault with a deadly weapon (§ 245, subd. (a)(1)); battery (§ 242); resisting an officer (§ 69); and battery on a peace officer (§ 243, subd. (c)(2)).

On October 6, 2023, Webster filed a motion for pretrial mental health diversion pursuant to section 1001.36. The motion sought mental health diversion in two pending cases: (1) the instant case arising from the incident

4

on May 14, 2023, and (2) another pending case in which Webster was charged with a battery that occurred on June 23, 2023.  The police report from the June 23, 2023 incident describes an unprovoked physical attack by Webster on the property manager at the same apartment complex where the earlier incident occurred.  Specifically, the apartment manager went to Webster's apartment to investigate reports of a loud and physical argument and because she wanted to collect Webster's overdue rent.  Webster told her, " '[F]--ck off bitch we don't have the money,' " and " '[Y]ou can't do sh-t about this.' "  When the property manager started to try to record the interaction, Webster pushed her against the wall and punched her in the chest six or seven times.

To support his motion, Webster attached police reports regarding the two incidents, along with a psychologist's evaluation dated September 8, 2023, and recent progress notes from Webster's psychiatrist.  Those psychiatrist's notes showed that changes were made to Webster's psychiatric medication following the May 14, 2023 incident and again following the June 23, 2023 incident.  The psychologist's report discussed the fact that Webster had received mental health intervention "for the past 3 to 4 years" and continued to participate in a county-run program.

In his evaluation, the psychologist concluded that Webster suffers from several mental disorders, namely, bipolar I disorder, major depressive disorder, posttraumatic stress disorder, and cannabis use disorder.  According to the psychologist, Webster's mental disorders played a significant role in the May 14, 2023 incident because "it appears that he experienced a type of manic episode that caused him to act inappropriately."  The psychologist further opined that Webster would be unlikely to pose a danger to the community if granted mental health diversion because he "appears to

5

be functioning in a stable and well directed fashion" and "indicates a desire to participate meaningfully in his treatment program."

The People opposed the motion for mental health diversion. Among other things, the People contend that Webster did not meet the suitability requirements for mental health diversion because "his current situation has shown he will not respond adequately to treatment while remaining in the public sector, and he poses an unreasonable risk of danger to public safety." As the People argued, "The facts show that [Webster] is consistently dangerous, volatile, and reactive to his environment. If his cases were diverted, [Webster] would be released into the same environment and [Webster] would be back where he started. It is necessary that [Webster] be placed into a controlled environment where his medication intake can be monitored, he can physically attend therapy sessions, and his dangerous and volatile aggression can be controlled."

On November 1, 2023, the trial court held a hearing on Webster's motion. In the course of that hearing, Webster became agitated while the trial court was explaining its preliminary thoughts, including the significance of Webster's use of a knife during the incident. Webster interrupted, "I'm military trained. I don't need a knife. I have military experience. I don't need a knife." The trial court ignored the comment and continued speaking. Webster again interrupted, stating, "There is laws and statutes that says I was in the right," and "That's part of my mental disability." Webster's remarks were apparently delivered in an agitated manner, as the bailiff stated, "You need to calm down sir."

The trial court immediately commented on Webster's behavior in court by stating, "And I have to say that the behavior here in court leaves the Court even more concerned that when faced with information that he doesn't

6

like or that is in any way critical of him, he gets extremely agitated." Later in the hearing, the trial court again commented on the significance of Webster's inappropriate in-court behavior: "And now even with a change in medication, he's unable to regulate himself in court appropriately and makes some sort of comment that, 'I don't need a knife. I'm military trained.' And I take that statement to mean, 'I don't need a knife to hurt someone. I can do it with my bare hands.'" The prosecutor informed the trial court that Webster became agitated and was unable to control himself during the preliminary hearing on July 17, 2023, as well: "I will let the Court know this -- the defendant's speaking out in court, this is not the first time this happened. There was a similar incident at the preliminary hearing during which we actually had to take a recess before the Honorable Judge McLaughlin because the defendant kept having outbursts while the victim was testifying about the knife and about the altercation with [his girlfriend]. So this is not the first time this has happened."

The trial court denied the motion for mental health diversion. The trial court concluded that although Webster met the eligibility requirements for mental health diversion, he did not meet the suitability requirements. Specifically, the trial court ruled that Webster would "pose an unreasonable risk of danger to public safety," based on the risk that "he will kill someone if he doesn't get his anger under control." The trial court explained, "I'm not disputing that his mental health issues . . . [were] a significant factor. My issue is . . . that I am afraid that without supervision -- diversion, he's on his own -- without close supervision, that he is at risk of committing an -- and I'll just be pointblank. I'm afraid he's going to kill someone. That his anger is out of control. That I do think he needs a treatment. I do think it needs to be more supervised . . . . But the level of anger over the -- and the response to it,

7

using a weapon, going after his significant other, swinging that weapon at bystanders, who were just trying to help her to leave, so he arms himself with both a weapon, and it appears he armed himself with two pit bulls because the pit bulls went after one of the officers, had its mouth around the foot of one of the officers. Grabs a -- grabs a weapon. I don't know if he took it -- how he got it, but he had a weapon in his hand. That situation alone could have resulted in the death of one of the police officers." The trial court concluded by stating, "I feel for him. But diversion -- this type of diversion is not meant for people that we are afraid are going to commit a very serious offense. And I think it's in his best interest that he have more supervision to hopefully prevent that from happening."

C.  *Subsequent Proceedings and Appeal*

On November 20, 2023, Webster pled guilty to one count of battery on a peace officer (§ 243, subd. (c)(2)), and the remaining counts were dismissed. The trial court placed Webster on felony probation for two years, on the condition, among others, that he serve 365 days in local custody and participate in mental health treatment and counseling as appropriate.

Webster obtained a certificate of probable cause and now appeals from the denial of his motion for pretrial mental health diversion.

II.

DISCUSSION

A.  *Applicable Legal Principles*

"In 2018, the Legislature enacted sections 1001.35 and 1001.36 to create a pretrial diversion program for defendants with certain mental health disorders. [Citation.] Pretrial diversion 'allows for the suspension of criminal proceedings and potential dismissal of charges upon successful completion of mental health treatment.'" (*Vaughn v. Superior Court* (2024)

8

105 Cal.App.5th 124, 133 (*Vaughn*).) Pursuant to section 1001.36, a trial court is authorized to grant mental health diversion when a defendant meets the statute's eligibility and suitability criteria.

A defendant is eligible if the trial court determines two requirements are satisfied: (1) a defendant has been diagnosed with a recognized mental health disorder, and (2) the disorder was "a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b)(2).) After determining eligibility, the trial court "must consider whether the defendant is suitable for pretrial diversion." (§ 1001.36, subd. (c).)

A defendant is suitable if: (1) in the opinion of a qualified mental health expert, the defendant's mental health disorder would respond to treatment; (2) the defendant consents to diversion and agrees to a waiver of speedy trial rights; (3) the defendant agrees to comply with treatment requirements; and (4) "[t]he defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (§ 1001.36, subd. (c)(1)–(4).)

The statute defines an "unreasonable risk of danger to public safety" by reference to the definition found in section 1170.18. Section 1170.18, in turn, defines "the concept as 'an unreasonable risk that the petitioner will commit a new violent felony within the meaning of' subdivision (e)(2)(C)(iv) of section 667 . . . .' " (*People v. Williams* (2021) 63 Cal.App.5th 990, 1001.) Violent offenses enumerated in section 667, commonly referred to as " 'super strikes,' " include "any homicide offense (including any attempted homicide offense), solicitation to commit murder, assault with a machine gun on a peace officer or firefighter, possession of a weapon of mass destruction, any serious or violent felony punishable by life imprisonment or death, and certain sex offenses." (*Williams, supra*, at p. 1001.) In deciding whether a

9

defendant poses an unreasonable risk of danger to public safety, "[t]he court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." (§ 1001.36, subd. (c)(4).)

Even where the defendant meets the statute's eligibility and suitability criteria, the trial court retains some "residual discretion" to deny diversion. (*Vaughn, supra*, 105 Cal.App.5th at p. 134.) That discretion "is not unfettered and must be exercised ' "consistent with the principles and purpose of the governing law." ' " (*Id*. at p. 135.)

We review a trial court's ruling on mental health diversion for abuse of discretion. (*People v. Graham* (2024) 102 Cal.App.5th 787, 795.) " 'A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence.' " (*Ibid.*)

B.    *The Trial Court Did Not Abuse Its Discretion*

Webster contends that the trial court abused its discretion in denying his motion because "[t]he evidence does not show that [Webster] would pose an unreasonable risk to public safety" if he was treated in the community for his mental health conditions.

   a.    *The Trial Court Was Not Required to Credit the Conclusion in the Psychologist's Evaluation*

To support his contention that the trial court's ruling was not supported by substantial evidence, Webster first relies on the psychologist's evaluation. Webster points to the psychologist's conclusion that Webster was "in the low moderate range of risk for acting out in an aggressive fashion," that medication and ongoing treatment "should help to minimize any

10

potential for aggressive behavior," and that because Webster "appears to be functioning in a stable and well directed fashion" and participating in treatment, it was "unlikely he would pose a danger to the community at large." According to Webster, the trial court reached its ruling by "ignoring [the psychologist's] report." The argument lacks merit.

For one thing, the trial court's comments at the hearing show that it did not "ignor[e]" the psychologist's evaluation. On the contrary, the trial court relied on the psychologist's evaluation for its conclusion that Webster was *eligible* for mental health diversion. It also looked to the psychologist's evaluation for information about whether Webster was attending his mental health counseling sessions.

Moreover, as the finder of fact, the trial court was entitled to credit the psychologist's evaluation on some subjects but to find it unpersuasive when analyzing whether, in light of all of the evidence presented, granting mental health diversion to Webster would pose an unreasonable risk of danger to public safety. (See *People v. Brown* (2024) 101 Cal.App.5th 113, 124 [explaining that although a psychologist concluded that the defendant "would not continue to pose an unreasonable risk if medicated—it [was] not the only evidence that the trial court considered," and "the existence of some evidence in support of either conclusion is not a sufficient basis for this court to supplant the findings of the trial court"].) Significantly, although the trial court did not expressly explain why it decided not to credit the psychologist's conclusion that Webster would not pose a danger to public safety, the value of the psychologist's conclusion was subject to question because the trial court was presented with evidence that was not available to the psychologist when he evaluated Webster's potential danger to the public. Specifically, the psychologist was not aware that, even while receiving psychiatric medication

11

and mental health counseling, Webster (1) violently attacked the property manager on June 23, 2023, and (2) became so agitated during two court appearances that he was unable to control himself and was disruptive. Those facts cast doubt on the psychologist's conclusion that Webster "appears to be functioning in a stable and well directed fashion" and had only a "low moderate" risk of acting out aggressively.

> b. *Webster's Challenge to the Accuracy of the Trial Court's Factual Statements Are Without Merit*

Webster also contends that the trial court's "reasons" for its ruling "were factually incorrect" in several ways.

First, Webster argues that "the evidence does not show that Webster was attacking [his girlfriend] with a knife." Instead, as Webster points out, witnesses reported he was using the knife to attempt to pry open the car door after his girlfriend locked herself inside.[4] However, Webster's argument relies on a mischaracterization of the trial court's ruling. The trial court did not state that Webster *attacked* his girlfriend with a knife. Instead, in explaining its ruling, the trial court referred to Webster's "level of anger . . . and the response to it, using a weapon, going after his significant other, swinging that weapon at bystanders." In earlier comments, the trial court made clear that Webster used the knife to try to prevent his girlfriend

---

[4] In his reply brief, Webster emphasizes that it was not resolved whether he used a butter knife or a butcher's knife, and he points out that a butter knife "which usually has a rounded tip and no sharp edges, is not considered a deadly weapon." As we have noted, however, even the witness who used the term "butter knife" viewed it as a dangerous weapon, as he was afraid his wife would be "stab[bed]" by it. Further, regardless of the characteristics of the knife, Webster was using it to try to stab the neighbor's friend, which shows that Webster viewed the knife as a weapon. Webster's willingness to attack bystanders with any kind of weapon is significant in assessing the potential danger he poses to the public.

from leaving, not to attack her. "It sounds like she's trying to get away. He arms himself with a knife, be it a butcher knife, a steak knife, or a butter knife, it's a knife. He tries to prevent her from leaving by using the knife."

Second, Webster states that "the trial court incorrectly characterized [him] as an aggressor against bystanders." According to Webster, that statement is incorrect because "the aggression was initiated by Webster's neighbors." However, Webster has not cited to any specific statement by the trial court characterizing Webster as "an aggressor against bystanders." Instead, the trial court referred to Webster's act of "swinging that weapon at bystanders, who were just trying to help her to leave." That is an accurate statement. The neighbor intervened in the dispute between Webster and his girlfriend. Webster reacted angrily and raised his knife, to which the neighbor responded by throwing a punch. Importantly, Webster also attacked two *other* people—the neighbor's friend and stepson—who were not aggressors.

Webster next faults the trial court for stating that "it appears [Webster] armed himself with two pit bulls because the pit bulls went after one of the officers." According to Webster, this statement was inaccurate because "the report does not indicate that Webster intentionally employed the dogs in an attack on the officers." However, the trial court's statement is a fair characterization of the evidence. The police report states that while refusing to come out of the apartment, Webster said, "I've got dogs too, if you guys want to try to come in. I've got a big ass dog." Then, when Webster charged out of the apartment, he let out his dogs, one of whom bit a police officer. Based on those facts, the trial court reasonably stated that it "appear[ed]" Webster had armed himself with the dogs.

13

Finally, Webster takes issue with the trial court's reference to his act of grabbing a police officer's baton. Referring to Webster's act of "grab[bing]" the baton, the trial court stated, "I don't know if he took it -- how he got it, but he had a weapon in his hand. That situation alone could have resulted in the death of one of the police officers." At another point in the hearing, the trial court observed, "[I]f he would take the baton from a police officer, what would stop him from taking a firearm when he's at this agitated state?" Arguing that "the evidence does not show that Webster intended to use the baton against an officer," Webster challenges the trial court's statement that the situation "could have resulted in the death" of an officer. Webster's criticism of the trial court is without merit. Based on the police officer's statement, Webster was not able to use the baton against the officers because the officer reacted by forcibly taking the baton from Webster. Moreover, the trial court was correct to observe that if Webster was able to grab a baton, he could just as well have grabbed a firearm if it was available. Webster's acts of (1) going after bystanders with a knife, (2) attacking a police officer's eye with his thumb, (3) resisting the officers as they tried to restrain him, and (4) grabbing the police baton, when taken together, support the trial court's reasonable inference that the situation could have resulted in the death of a police officer if Webster had been able to access a deadly weapon.

  c. *The Case Law Cited by Webster Is Inapposite*

In arguing that insufficient evidence supports the trial court's ruling, Webster contends that his case is similar to *People v. Whitmill* (2022) 86 Cal.App.5th 1138. We are not persuaded, as the defendant's conduct in *Whitmill* was nothing like Webster's uncontrolled violent conduct on May 14, 2023, and again on June 23, 2023.

14

In *Whitmill*, based on his act of firing a gunshot into the air during a confrontation with his girlfriend, the defendant pled guilty to the discharge of a firearm with gross negligence. (*Whitmill*, *supra*, 86 Cal.App.5th at pp. 1142, 1147.) The defendant had no history of violent offenses, and during the incident at issue, the defendant reacted by "running away from further confrontation, throwing away his firearm, and peacefully complying with law enforcement's request that he come forward and (presumably) be arrested." (*Id*. at p. 1151). Based on those facts, *Whitmill* concluded that insufficient evidence supported a finding that the defendant posed a risk of committing a super strike if granted mental health diversion. *Whitmill* is inapposite here because, in contrast to the largely conflict-avoidant and compliant defendant in *Whitmill*, Webster acted in an extremely violent manner throughout the May 14, 2023 incident and again on June 23, 2023, including launching an attack on responding police officers.

In sum, Webster has failed to persuade us that insufficient evidence supports the trial court's finding that mental health diversion would pose an unreasonable risk of danger to public safety. The evidence shows that Webster continued to engage in uncontrolled, agitated and sometimes violent behavior in the time period after the May 14, 2023 incident despite the fact that he was participating in ongoing psychiatric treatment and mental health counseling. In light of Webster's continued uncontrolled behavior, Webster's conduct on May 14, 2023, in which he physically attacked and injured a police officer, grabbed a police weapon, and used a knife against his neighbors established an unreasonable risk that Webster would commit the super strike of homicide or attempted homicide if he continued to receive mental health treatment in the community rather than under the conditions of increased supervision that would result from a criminal conviction.

15

## DISPOSITION

The judgment is affirmed.

IRION, Acting P. J.

WE CONCUR:

DATO, J.

RUBIN, J.

16